## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

LOUIS C. JAMES, III,           )
                                      )
        Plaintiff,           )
                                      )     No. 14 C 3345
vs.                             )
                                      )     Magistrate Judge Schenkier
CAROLYN W. COLVIN, Acting    )
Commissioner of Social Security,  )
                                      )
        Defendant.       )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Louis C. James, III, seeks reversal and remand of the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Supplemental Security Income ("SSI") (doc. # 15). The Commissioner filed her own motion seeking affirmance of the decision denying benefits (doc. # 22). For the following reasons, we grant Mr. James's motion, deny the Commissioner's motion, and remand the case for further consideration consistent with this Memorandum Opinion and Order.

### I.

We begin with the procedural history of this case. Mr. James, by and through his mother, applied for SSI on August 21, 1995, when he was four years old, alleging disability due to hearing and speech problems (R. 21). In August 1996, the Department of Disability Services ("DDS") found that Mr. James functionally met listing 111.09A (Communication Impairment), and he began receiving benefits thereafter (*Id.*). These benefits were reevaluated and extended

---

[1] On June 2, 2014, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. ## 7, 9).

twice, in 2000 and 2004, based on listing 112.10A (Autistic Disorder and Other Pervasive Disorders) (*Id.*).

As required by law, Mr. James's disability benefits were re-assessed under the rules pertaining to adults when he turned 18 years old (R. 21). As of January 31, 2010, the DDS deemed Mr. James no longer disabled, and his benefits ceased (*Id.*). This ruling was upheld on appeal, at which point Mr. James requested, and was granted, a hearing before an Administrative Law Judge ("ALJ") (*Id.*). The hearing occurred before ALJ Jose Anglada on November 28, 2012 (R. 50-81). The ALJ issued an opinion denying benefits on December 28, 2012 (R. 18-38). On March 4, 2014, the Appeals Council then denied Mr. James's request for review, making the ALJ's ruling the final decision of the Commissioner (R. 8-10). *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We begin with a summary of the administrative record. Part A briefly sets forth Mr. James's background, followed by his mental health medical record in Part B. Part C discusses the testimony provided at the hearing before the ALJ, and Part D sets forth the ALJ's written opinion.

## A.

Mr. James was born on July 20, 1991 (R. 233). He has no physical health problems but has a history of learning difficulties and an autistic disorder. Throughout high school, Mr. James received paraprofessional support and was placed in special education programs for students with autism (R. 200). He graduated from high school in 2009 and began attending Northwestern College in Fall 2010 (R. 331).[2] He is currently enrolled there on a part-time basis to earn his

---

[2] Northwestern College enables students to earn a certificate or degree in a chosen field in as few as one to two years. *See* www.nc.edu/. Northwestern College is not affiliated with Northwestern University.

associate's degree (R. 57). Mr. James is unemployed and is supported by his aunt, with whom he lives (R. 60).

**B.**

The medical record begins in October 2003, when Mr. James was 12 years old, with an evaluation and summary of Mr. James's Individualized Education Program ("IEP") with the Chicago Public Schools ("CPS") (R. 244-61). The IEP indicated that Mr. James had two disabilities: autism and a speech/language impairment (R. 246), and that he was eligible for special education and services related to improving his language and social/emotional skills (R. 247-49). The IEP further indicated that a regular education classroom with autism-related services was insufficient to address Mr. James's "significant social and academic deficits," and therefore he was placed in a smaller class with one-on-one, specialized instruction (R. 256). Mr. James also required an individual aide to facilitate socialization and to model desired behaviors (R. 247-48), and he also received several school-based modifications, including separate special education classes, visual aids, extended time for assignments, and modified grading criteria (R. 261).

In March 2004, Mark Langgut, Ph.D., examined Mr. James (who was then approaching 13 years old) on behalf of the DDS and completed a Report of Psychological Assessment (R. 240-43). Dr. Langgut observed that Mr. James had poor social and interpersonal skills, was unable to explain himself, became easily confused, stammered, and was difficult to understand (R. 240). He noted that Mr. James had poor social relationships, a history of hearing impairments, little recognition of his own moods, slowed thought processes, and poor to average coherence (R. 241-42). Following administration of the Wechsler Intelligence Scale for Children, Mr. James earned a full scale IQ score of 64, indicating that he was operating in the mentally deficient range of intellectual ability (R. 242). However, Dr. Langgut questioned the validity of

3

the score given Mr. James's limited interest in the verbal tasks presented to him and his observation that Mr. James had a much greater enthusiasm for performance-related tasks (*Id.*). Dr. Langgut provided diagnoses of "Adjustment Disorder with Depressed Mood and Learning Disorder, Not Otherwise Specified" and "Overall Mentally Deficient Intellectual Functioning" (R. 243).

In October 2007, when Mr. James was 16 years old, psychologist Ervin Hassman performed a triennial evaluation (R. 325-28). As part of the evaluation, Dr. Hassman reviewed teacher interview data indicating that Mr. James was meeting course standards and receiving B's and C's in his classes (R. 325). However, following the administration of the Woodcock-McGrew-Werder Mini-Battery of Achievement test, Dr. Hassman noted that Mr. James's basic skills (a combined measure of reading, writing, and mathematics skills), as compared to others at his grade level, "[was] in the very low range" (R. 326). Additionally, following the administration of the Reynolds Intellectual Assessment Scales (RIAS), Dr. Hassman found Mr. James to have below average cognitive ability with a significant difference between verbal and nonverbal processing skills, and academic deficits with respect to reading, writing, and math skills (R. 327-28). Dr. Hassman noted that Mr. James was cooperative and exhibited good effort while completing these tasks (R. 327).

In September 2009, Mr. James's brother, Tony Dickerson, completed an SSA Function Report to evaluate Mr. James's physical and mental status (R. 174-81). Mr. Dickerson noted that Mr. James, who was 18 years old at the time of the evaluation, had some problems talking clearly, but that his speech could be understood "most of the time" (*Id.*). He also noted that Mr. James's ability to pay attention and remain on-task was "somewhat limited," as Mr. James did not usually finish tasks that he started (*Id.*).

Also in September 2009, an SSA representative conducted an in-person interview with Mr. James for the purpose of completing a disability report (R. 183-92). The representative noted that Mr. James had been working part-time at a hotel (two days a week for five hours a day) for two months, but that he stopped working after his mother's death (R. 187).

In October 2009, when Mr. James was 18 years old and a senior in high school, his special education teacher at Kennedy High School completed a teacher questionnaire required by the SSA (R. 193-200). The teacher had known Mr. James for four years and noted that in the 9th and 10th grades he was placed in an educational program for students with autism (R. 200). Additionally, Mr. James received "paraprofessional support to help him with his student's [sic] responsibilities and overcome social and emotional problems" (*Id.*). The teacher further observed that Mr. James had "an obvious problem" with acquiring and using information and focusing long enough to finish an assigned task (R. 194-95), and a "slight to obvious problem" interacting and relating with others on a daily basis, respecting authority, and in caring for himself on a daily basis (R. 196-98).

In November 2009, Edmond Yomtoob, Psy.D., examined Mr. James on behalf of the DDS (R. 262-65). Dr. Yoomtoob administered the Wechsler Adult Intelligence Scale–Fourth Edition (WAIS-IV) to measure Mr. James's intellectual functioning (R. 262, 264). Mr. James scored a 71 on the full scale IQ test, placing him in the mild mental retardation range of intellectual functioning (R. 264). However, Dr. Yomtoob felt that Mr. James was deliberately presenting himself "in way that appeared to be an intentional effort to deflate his IQ test scores" (R. 263). For example, when Dr. Yomtoob asked Mr. James what he eats, he responded "guts," and when asked "what is water made of," Mr. James said "clouds" (R. 263-64). During numerous tasks, such as "symbol search" and "coding," Mr. James responded to 23 and 37 items, respectively, and got every item wrong (R. 264). As a result, Dr. Yomtoob noted that although

5

Mr. James may have a learning problem, he would defer diagnosis "until Mr. James decides to be more forthcoming with testing" (R. 265).

On December 14, 2009, non-examining DDS psychologist Ronald Havens, Ph.D., completed a Psychiatric Review Technique and a Mental Residual Functional Capacity ("RFC") assessment of Mr. James (R. 269-86). In his psychiatric review, Dr. Havens based his medical disposition on listings 12.02 (Organic Mental Disorders) and 12.10 (Autism and Other Pervasive Developmental Disorders) (R. 269). He found that Mr. James had "mild" restriction of daily living activities, "moderate" difficulties in maintaining social function, "moderate" difficulties in maintaining concentration, persistence or pace, and no extended episodes of decompensation (R. 279). In his mental RFC assessment, Dr. Havens concluded that Mr. James's impairments are "severe" and that "he would have difficulty with detailed assignments," but that some reports "suggest that he can understand and remember well enough to engage in simple assignments on a sustained basis" and that he can "concentrate and persist adequately enough to perform simple, repetitive, routine tasks" (R. 285). However, Dr. Havens also opined that Mr. James has "limited social skills and lacks the emotional temperament required to interact appropriately with others or to accept criticism from a supervisor and should not be expected to deal with the public or to work under close critical supervision" (Id.).

On January 8, 2010, the DDS determined that Mr. James, by then over the age of 18 years old, no longer qualified as disabled pursuant to the rules applied in determining disability in adults (R. 201).

On December 13, 2010, Mr. James visited Evaldas Radzevicius, M.D., for a complete neurobehavioral evaluation that lasted forty-five minutes (R. 335-36). Dr. Radzevicius noted Mr. James's history of learning problems and special education classes (R. 335). While observing Mr. James throughout the evaluation, Dr. Radzevicius noted dysfluent speech, difficulty naming

objects, expressive aphasia, and cognitive functioning in the borderline intellect range (R. 335-36). He provided diagnoses of Learning Disorder-Not Otherwise Specified, Autistic Disorder, and Borderline Intellectual Functioning (R. 336), but he surmised that Mr. James's diagnoses could change as additional information became available (*Id.*). He stated that Mr. James "has signs of learning disability and communication problems, although he seems overall to be well adjusted [and] attends college" (*Id.*).

On February 8, 2011, non-examining DDS psychologist Dr. Kirk Boyenga, Ph.D., completed a Psychiatric Review Technique and Mental RFC assessment of Mr. James (R. 287-303). In his psychiatric review, Dr. Boyenga based his medical disposition of Mr. James on listings 12.02 (Organic Mental Disorders) and 12.10 (Autism and Other Pervasive Developmental Disorders) (R. 291). Dr. Boyenga found that Mr. James had a "mild" restriction of daily living activities, "moderate" difficulties in maintaining social functioning, "moderate" difficulties in maintaining concentration, persistence or pace, and no extended episodes of decompensation (R. 301). In his functional capacity assessment, Dr. Boyenga found Mr. James able to perform simple, routine, repetitive tasks with reduced interpersonal contact on account of his impaired social skills (R. 289).

On February 14, 2011, Mr. James visited licensed psychologist Jacqueline Rea, Ph.D., for a neuropsychological evaluation aimed at determining his level of cognitive functioning in light of his previous Autism Spectrum Disorder diagnosis (R. 309-24). Dr. Rhea administered numerous tests to measure Mr. James's neuropsychological functioning (*Id.*). Dr. Rea noted good effort and cooperation on Mr. James's part, and considered all of the test results to provide a valid indication of his current level of neuropsychological functioning (R. 311). Dr. Rea opined that Mr. James's presentation was consistent with the presence of a language-based disorder (R. 317). She concluded that Mr. James's Autism Spectrum Disorder ("ASD") was best

7

classified as Pervasive Developmental Disorder, Not Otherwise Specified ("PDD-NOS") and accordingly made that diagnosis (R. 318). She also diagnosed Mr. James with reading, mathematics, and written expression disorders (*Id.*). Dr. Rea opined that Mr. James had the ability to carry out short and simple verbal instructions, but that he needed simple verbal reminders and visual supports to enhance recall (*Id.*). In addition, she found that Mr. James's ability to understand and remember detailed verbal instructions was markedly limited, and therefore he would require simple, repeated instructions with visual supports, modeling, and demonstrations (R. 318-19). Dr. Rea noted that Mr. James has the ability to maintain regular attendance, sustain an ordinary routine, and make simple work-related decisions (*Id.*). But, given Mr. James's markedly limited ability to sustain attention and concentration for extended periods of time, he should not be in close proximity to co-workers, nor should he face time demands due to his slower processing speed (*Id.*). Dr. Rea further recommended that Mr. James have limited and supervised interaction with both the general public and co-workers (*Id.*). Additionally, she advised that Mr. James's work expectations be made explicit because he has a "markedly limited" ability to set realistic goals and plan steps to reach them (*Id.*).

Shortly after his visit with Dr. Rea, Mr. James revisited Dr. Radzevicius on March 31, 2011 for a follow-up appointment (R. 333-34). Dr. Radzevicius did not mention Dr. Rea's report, and it is not clear that it was available to him at the time of the March 31st appointment. After conducting the Beck Depression Inventory (BDI), Dr. Radzevicius found that Mr. James was mildly depressed, as would be expected after his mother's death, but that he was not suicidal and his condition did not warrant medication (R. 333). Dr. Radzevicius did not formally test Mr. James's cognitive functioning at the follow-up appointment, but noted that he appeared clinically unchanged from his previous examination on December 13, 2010 (*Id.*).

8

## C.

On November 28, 2012, the ALJ conducted a hearing at which Mr. James, his counsel, his aunt, and a vocational expert ("VE") were present. The ALJ first questioned Mr. James, who stated that he had graduated from high school and was in his second year towards earning his associate's degree at Northwestern College (R. 56-58). Mr. James stated that he attends school on a part-time basis because he has a hard time focusing and remembering, and is always daydreaming and pacing (R. 67). Additionally, he indicated that he receives extended time for assignments and tests, and sees tutors "very often" (R. 68). Mr. James testified that he has a "hard time" understanding what the teacher says, and that sometimes he forgets to raise his hand and ask for clarification because he will daydream and lose focus (*Id.*). Mr. James reported earning "C average" grades and that he has had to repeat "a lot of courses" (R. 58-59).

Mr. James lives with his aunt, who is on disability (R. 60). He reported taking the bus to school twice a week (R. 61), but that he needed his aunt to show him how to take the bus before being able to do it on his own (R. 69). Occasionally, he stays at school after class to complete his schoolwork, but otherwise he studies at home (R. 61). On the days Mr. James does not have class, he does chores around the house at the request of his aunt (R. 61-62), although his aunt must remind him "very often" to complete the chores because he forgets about them and cannot focus (R. 68). He noted that he feels frustrated and depressed when he is unable to remember his chores (*Id.*). Mr. James believed that he could only sustain focus for "at least like a couple of minutes" before becoming distracted, and that his mind wanders when he tries to focus for too long (*Id.*).

When the ALJ asked Mr. James what he would like to do "after school," Mr. James explained that his aunt takes him out "to do things" after school (R. 64). The ALJ clarified for Mr. James that he wanted to know Mr. James's plans for after he earned his associate's degree

9

(*Id.*). To that, Mr. James explained that he was thinking about becoming an "arthur" (*Id.*). Upon the ALJ's request, Mr. James clarified that an "arthur" is someone who writes books, and he thereafter expressed an interest in drawing and in writing cartoon stories (R. 65).

When the ALJ asked Mr. James if he ever does anything for entertainment, Mr. James responded that he either plays video games or watches television alone (R. 62). He mostly enjoys watching cartoons and sports (R. 64). When prompted, Mr. James added that sometimes his aunt takes him out to the movies (R. 62). Mr. James testified that he does not have problems interacting with other people, but that he does not really spend time with anyone besides his aunt and his father (R. 69). When asked about his friends, Mr. James said that they rarely come over because he is an "outsider" (R. 62, 69). Mr. James explained that he generally feels sad and depressed because he remembers things about the past and "just feel[s] sad" (R. 69).

Mr. James testified that he does his own laundry, irons some of his clothes, and bathes and dresses himself (R. 63). He noted, again, that he has difficulty doing his chores at a fast pace and must be reminded (R. 69). He uses the microwave to make simple meals (R. 63).

Mr. James's aunt, Pamela James, testified that Mr. James has lived with her since 2009, following the death of Mr. James's mother (R. 70-71). She explained that Mr. James failed his classes when he tried to maintain a full course load, so he currently attends school part-time and also receives assistance from a tutor and counselor (R. 71-72). Ms. James further noted that Mr. James has difficulty learning and understanding (R. 72). He must receive instructions "at least two or three times" and needs both verbal and visual reminders about how to do tasks, including his household chores (R. 72-73). Mr. James completes long-term tasks slowly and has difficulty focusing (R. 72). Ms. James stated that Mr. James can do household chores on his own but also needs reminders (R. 73). When asked about Mr. James's general mood, Ms. James reported that

sometimes Mr. James is sad and seems confused, but that at other times he is "a happy go lucky kid" (R. 74).

Finally, Vocational Expert Deanne Bloom testified. The ALJ presented the VE with a hypothetical worker with greater than a high school education, but who has been in special education classes and has attended school on a part-time basis because he has more difficulty learning than does the average student (R. 75). The ALJ then added the following limitations: he would be unable to understand, remember, and carry out detailed and complex job tasks; he is not suited for work that requires intense focus and concentration for extended periods; he may only have casual interaction with the general public; and he may be expected to be off-task about five percent of the time in an eight-hour workday (Id.). With these limitations in place, the VE opined that the hypothetical worker could work as a laundry worker, janitor, or sorter (R. 76-77). The VE stated that the hypothetical worker could work at more or less his own pace at these three jobs, but that the worker would be required to meet the production quota for the day or week in each position (R. 78-79). He would also need to remain on-task 85 percent of the time and not miss more than one and three-quarters days of work per month (R. 77-78). If the hypothetical worker needed repeated verbal and visual reminders, he could receive printed instructions for some of the required job duties in both the laundry and janitorial positions (R. 79). However, there would be no jobs available for the hypothetical worker if he needed the supervisor to repeatedly demonstrate or explain how to perform work duties (Id.). The VE explained that all of the suggested jobs could be performed alone, with no tandem-type tasks with co-workers, but that the hypothetical worker would need to interact with co-workers occasionally (R. 80).

**D.**

On December 28, 2012, the ALJ issued a 17-page, single-spaced written opinion finding Mr. James ineligible for continuing SSI as of January 31, 2010 because he had attained the age of 18, and was not disabled pursuant to the rules for disability as applied to adults (R. 21-38). In evaluating Mr. James's claim, the ALJ applied the five-step sequential process detailed in 20 C.F.R. § 404.1520(a)(4), which required him to analyze whether the claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment that meets or equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) can perform his past work; and (5) is capable of performing other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). If the ALJ finds at Step 3 that the claimant has a severe impairment that does not equal one of the listed impairments, he must assess and make a finding about the claimant's RFC before moving on to Step 4. *See* 20 C.F.R. § 404.1520(e). The ALJ then uses the RFC to determine at Steps 4 and 5 whether the claimant can return to his past work or different available work in the national economy. *See* 20 C.F.R. § 404.1520(e)-(g). The claimant bears the burden of proof at Steps 1 through 4, but the burden shifts to the Commissioner at Step 5. *See Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

The ALJ found that Step 1 did not apply to Mr. James since this step is not used for redetermining disability at age 18 (R. 22). At Step 2, the ALJ found that since January 2010, Mr. James has had the following severe impairment: learning disorder (R. 27). The ALJ also considered Mr. James's suggested limitation of a previously fractured clavicle, but found that it did not significantly interfere with Mr. James's ability to engage in basic work activities and thus concluded that it was not considered a "severe" impairment (R. 27-28). At Step 3, the ALJ concluded that Mr. James's severe impairment did not meet or equal any of the impairments

12

listed in the Listing of Impairments (R. 28). The ALJ then determined that Mr. James has the RFC to perform a full range of work at all exertional levels but with non-exertional restrictions reflecting his cognitive limitations (R. 30). The ALJ found that Mr. James has the RFC to perform a full range of work at all exertional levels, but with certain limitations, including that he "would be unable to understand, remember, and carry out detailed and complex job tasks; he is not suited for work that requires intense focus and concentration for extended periods; he may only have casual interaction with the general public and would be expected to be off task 5% of the time in an 8-hour workday" (*Id.*). At Step 4, the ALJ found that Mr. James had no relevant past work history, so the ALJ proceeded at Step 5 and concluded that Mr. James could perform the jobs of laundry worker, janitor, or sorter (R. 38). Accordingly, the ALJ found Mr. James not disabled.

### III.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning evidence a reasonable person would accept as adequate to support the decision. *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013). This Court's role in disability cases is limited to reviewing whether the ALJ's decision is supported by substantial evidence. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and her conclusion, but not necessarily to provide a thorough written evaluation of every piece of evidence in the record. *Pepper*, 712 F.3d at 362. In asking whether the ALJ's decision has adequate support, this Court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Shideler v. Astrue*, 688, F.3d 306, 310 (7th Cir. 2012).

Mr. James makes several arguments in favor of remand. *First*, he contends that the ALJ failed to explain why he neglected to accept all of the limitations suggested by Dr. Rea and Dr.

Boyenga in their functional evaluations. *Second*, Mr. James contends that the ALJ improperly assessed his RFC. *Third*, he maintains that the ALJ's credibility analysis was insufficient. We address each in turn.

A.

Mr. James first argues that the RFC fashioned by the ALJ failed to incorporate all of the limitations proposed by consultative examining neuropsychologist Dr. Rea and DDS consultant Dr. Boyenga. Before we address the opinions of these doctors, we first consider their treatment relationship with Mr. James, which in turn informs the way in which an ALJ should assess their opinions.

A "treating source" physician is defined as a "physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. Conversely, a non-treating source is "a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you." *Id.* An ALJ is required to assign a treating source physician's opinion controlling weight, provided the opinion is supported by "medically acceptable clinical and laboratory diagnostic techniques[,]" and is "not inconsistent" with substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010). The same deference is not necessarily granted to a non-treating source's opinion—although the ALJ must still evaluate such an opinion according to certain regulatory factors. *See* 20 C.F.R. § 404.1527(c); *White v. Barnhart,* 415 F.3d 654, 658 (7th Cir. 2005). These factors include how well the physician supported and explained his opinion, whether his opinion is consistent with the record as a whole, whether he is a specialist in the field of the claimant's impairments, and any other relevant factors of which the ALJ is aware. 20 C.F.R. § 404.1527(c)(2); *Simila v.*

14

*Astrue*, 573 F.3d 503, 515 (7th Cir. 2009). If the ALJ discounts the physician's opinion after considering these factors, we must allow that decision to stand so long as the ALJ "'minimally articulate[s]' his or her justification for rejecting or accepting specific evidence of a disability." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) (quoting *Rice v. Barnhart*, 384 F.3d 363, 372 (7th Cir. 2004)).

1.

With these parameters in mind, we turn first to Dr. Rea, who examined Mr. James just once, in February 2011. During her examination of Mr. James, Dr. Rea administered a comprehensive neuropsychological evaluation, which included behavioral observations and various tests to measure Mr. James's intellectual abilities. Dr. Rea memorialized her findings in an 11-page summary. That summary included recommendations associated with the diagnosis of PDD-NOS and disorders relating to reading, writing, and mathematics, including the need for verbal reminders and visual supports to enhance Mr. James's recall of work procedures and the elimination of a time demand regarding performance on account of his slower cognitive processing speed (R. 309-20). Dr. Rea found that Mr. James demonstrated good effort during the evaluation and thus concluded that his test scores were a valid indication of his current level of neuropsychological functioning (R. 311). Based upon Mr. James's performance and behavior, Dr. Rea opined that he could "understand, remember, and carry out simple routine but not detailed and complex job tasks," but that Mr. James "should not be placed under a time demand," should have "limited and supervised interaction" with coworkers, and should have "instructions [that] are made simple, are repeatedly presented and provide[ ] [him] with visual supports, modeling, and demonstrations" (R. 318-19). She also found that Mr. James has a markedly limited ability to maintain attention and concentration for extended periods (R. 319).

Although Mr. James's appointment with Dr. Rea was lengthy, one single treatment visit between doctor and patient is insufficient to render the relationship a treating-source relationship. On-going treatment over at least some period of time is required for this status. *See* 20 C.F.R. § 404.1502; *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005). Thus, Dr. Rea served as a non-treating source physician to Mr. James, and we begin our analysis by noting that the ALJ was not required to give her opinion controlling weight.

In his opinion, the ALJ engaged in a lengthy recitation of the various tests Dr. Rea conducted. However, for purposes of the RFC analysis—which occurred once the ALJ determined that Mr. James did not meet any single listing—the ALJ did not articulate the weight he assigned to Dr. Rea's findings or explain his reasons for including some of her findings while excluding others. Rather, the ALJ simply stated that Mr. James's RFC "is not inconsistent with the recommendations of Dr. Rea in Exhibit 11F who noted similar limitations, and to that extent, I give credence to some of her recommendations" (R. 36-37). This analysis is inadequate. Summarizing or cataloging evidence from medical reports is not a substitute for analysis or explanation. *See Smith v. Astrue,* No. 09 CV 6210, 2011 WL 722539, at *12 (N.D. Ill., Feb.22, 2011); *see also Keller v. Colvin*, No. 13 C 6029, 2014 WL 6613383, at *11 (N.D. Ill., Nov. 21, 2014) (underscoring "the importance of an overall RFC evaluation that is proper and supported by "pertinent findings and conclusions").

In addition, an ALJ may not adopt some portions of a medical opinion without explaining why he rejected others. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). In this case, the ALJ never specifically articulated which of Dr. Rea's recommendations he agreed with and which he rejected, nor did the ALJ mention the controlling weight factors applicable to non-treating source physicians so as to explain why he afforded Dr. Rea's opinion only partial weight. *See Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) (the ALJ may not selectively

16

include and discuss only the evidence that favors his ultimate conclusion). The ALJ's failure to minimally articulate his treatment of Dr. Rea's opinion leaves this Court guessing as to why he excluded Dr. Rea's findings, for instance, that Mr. James "should not be placed under a time demand and should have instructions that are simple, repeatedly presented, and include visual supports, modeling, and demonstrations" (R. 318).

That omission could be significant, as the VE testified that if a supervisor were required to continuously remind a person how to perform a job, "that would not be allowed" ( R. 79). We recognize that the ALJ discussed some of Dr. Rea's testing results in connection with the paragraph B analysis required for determining whether Mr. James met or equaled a listing. But, SSR 96–8p clarifies that the limitations identified in the 'paragraph B' and 'paragraph C' are criteria used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process," while a mental RFC analysis "requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C." The ALJ's lengthy paragraph B discussion is not a substitute for a thorough RFC analysis, which we find lacking here.

Accordingly, we conclude that the ALJ did not provide a logical bridge explaining why he omitted from the RFC some, but not all, of Dr. Rea's findings. *See Young v. Barnhart,* 362 F.3d 995, 1002 (7th Cir. 2004) (ALJ is not required to mention every piece of evidence but must provide an "accurate and logical bridge" between the evidence and the conclusion that the claimant is not disabled, so that "as a reviewing court, we may assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review"); *Filus v. Astrue,* 694 F.3d 863, 869 (7th Cir. 2012) (ALJ must "minimally articulate" his reasoning for rejecting an opinion in the record). On remand, the ALJ should discuss more thoroughly his rationale for adopting some of Dr. Rea's recommendations while rejecting others, and engage in a more

thorough RFC analysis, bearing in mind that an ALJ may not selectively include and discuss only the evidence that favors his ultimate conclusion. *Moore*, 743 F.3d at 1123.

2.

We turn now to the opinion evidence from Dr. Boyenga, who (like Dr. Rea) did not have a treatment relationship with Mr. James. Dr. Boyenga was a "nonexamining source"—meaning a physician, psychologist, or other acceptable medical source who provided an opinion in the case but who did not examine the claimant. *See* 20 C.F.R. § 404.1502. But even so, the ALJ was required to evaluate the strength of Dr. Boyenga's medical opinion (as well as those of the other DDS consulting physicians) through an assessment of the regulatory factors applicable to non-treating sources. *See Maziarka v. Colvin*, 983 F. Supp. 2d 991, 1005 (N.D. Ill. 2013).

Dr. Boyenga found Mr. James to have a "mild" restriction of daily living activities, "moderate" difficulties in maintaining social function, "moderate" difficulties in maintaining concentration, persistence or pace, and no extended episodes of decompensation (R. 301). Dr. Boyenga acknowledged Mr. James's history of autism and a learning disorder and found his impairments to be "severe" (R. 303). In his RFC analysis, the ALJ stated that Dr. Boyenga found Mr. James to have the mental capacity to perform simple, repetitive and routine tasks (R. 32). The ALJ also stated that Dr. Boyenga found Mr. James to be:

> moderately limited in the ability to understand, remember and carry out detailed instructions, moderately limited in the ability to maintain attention and concentration for extended periods, moderately limited in the ability to sustain an ordinary routine without special supervision, <u>moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods,</u> moderately limited in the ability to interact with the general public, and moderately limited in the ability to respond appropriately to changes in the work force.

*(Id.)* (emphasis added).

18

Despite stating these findings, the ALJ neither incorporated into the RFC Dr. Boyenga's finding that Mr. James would require "an unreasonable number and length of rest periods," nor explained his failure to do so. The ALJ did not provide any indication of the weight he ascribed to Dr. Boyenga's opinion; indeed, when assessing Mr. James's RFC, the ALJ only referred to "the DDS state agency consultants" as a collective and ascribed to all of them the same conclusion—that Mr. James could perform simple, repetitive, and routine work (R. 36). Not only is this analysis insufficient, but it also was inconsistent with the reports of DDS consultants who did not state that Mr. James would require numerous and lengthy rest periods. Again, the failure to grapple with this evidence cannot be dismissed as harmless, as the need for an "unreasonable" number and length of rest periods may run afoul of the VE's statement that a hypothetical person with Mr. James's limitations could not perform competitive work if he were not on task at least 85 percent of the time (R. 78).

Accordingly, a remand is necessary in order for the ALJ to consider all the medical evidence of record, and to explain the reasons for the weight he affords Dr. Boyenga's opinions. *See* 20 C.F.R. § 1527; *Jelinek v. Astrue,* 662 F.3d 805, 811 (7th Cir. 2011).

## B.

Mr. James argues next that the ALJ failed to include within the RFC any limitations that addressed his difficulties with concentration, persistence and pace. We agree that this matter should be revisited on remand in light of our discussion of Drs. Rea and Boyenga.

The ALJ adopted an RFC that limited Mr. James to simple, routine tasks that do not require intense focus and concentration for extended periods. However, both Drs. Rea and Boyenga indicated that Mr. James also would struggle with persistence and pace. The inclusion of a limitation with respect to concentration alone does not fully address this impairment. *See, e.g., Stewart v. Astrue,* 561 F.3d 679, 685 (7th Cir. 2009) (limitation to simple, routine tasks

19

failed to sufficiently address claimant's limitations in concentration, persistence, or pace); *see also* SSR 85–15, 1985 WL 56857 (1985) (providing that "[b]ecause response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job").

We point out that other courts, both within and outside of this district, have found that limitations with respect to production quotas are an effective way to handle difficulties with concentration, persistence and pace. *See, e.g., Murphy v. Astrue,* No. 11 C 831, 2011 WL 4036136, at *12 (N.D. Ill., Sept. 12, 2011) (restricting a claimant to slower-paced, non-stressful jobs without strict quotas sufficiently accounts for moderate limitations in concentration, persistence, and pace); *Smith v. Halter,* 307 F.3d 377, 380 (6th Cir. 2001) (restricting hypothetical to jobs without quotas, rather than to simple tasks, adequately addresses impairment in concentration). On remand, the ALJ must either adopt an RFC that addresses Mr. James's limitations with respect to persistence and pace, or explain why such limitations are unnecessary.

## C.

Next, we address briefly Mr. James's allegation that the ALJ's credibility assessment was insufficient. The ALJ found that the extent of Mr. James's alleged symptoms were not credible, and in support noted that Mr. James could travel independently by bus, cook food using a microwave, clean and dress himself, play basketball or football, and play computer and video games. The ALJ also noted that Mr. James was in school receiving "C" grades, had held a full-

time job for a year, and had appeared to undermine various tests administered to him in an intentional effort to deflate his test results (R. 36).[3]

ALJs are in the best position to evaluate a witness's credibility, and their assessment will be reversed only if "patently wrong." *Schaaf*, 602 F.3d at 875; *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). That means that this Court will not substitute its judgment regarding the claimant's credibility for the ALJ's, and that Mr. James "must do more than point to a different conclusion that the ALJ could have reached." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010). In assessing a claimant's credibility when the allegedly disabling symptoms may not be objectively verifiable, an ALJ must first determine whether those symptoms are "consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a); SSR 96-7p, 1996 WL34186, at *2 (S.S.A., July 2, 1996); *Arnold v. Barnhard*, 473 F.3d 816, 822 (7th Cir. 2009). If not, SSR 96-7p requires the ALJ to "consider the entire case record and give specific reasons for the weight given the individual's statements." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (quoting SSR 96-7p). The ALJ should look to a number of factors to determine credibility, including "the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and 'functional limitations.'" *Id.* (citing 20 C.F.R. § 404.1529(c)(2)-(4)). Finally, an ALJ must connect his credibility determinations by an "accurate and logical bridge" to the record evidence. *Ribaudo v. Barnhart*, 458, F.3d 580, 584 (7th Cir. 2006); *see also Sayles v. Barnhart*, No. 00 C 7200, 2001 WL 1568850, at *7 (N.D. Ill. Dec. 7, 2001) (Schenkier. J.) (finding a particular need to establish logical bridge in credibility determinations).

---

[3] Whether Mr. James held a job for a year is unclear. The ALJ cited Dr. Rea's report in support of his finding that Mr. James held a job doing hotel laundry for approximately 12 months (R. 36). However, in her report, Dr. Rea only stated that Mr. James "reportedly" held this job (R. 310). Furthermore, Mr. James's interview with a DDS representative indicated that he worked at a hotel for only two months (from April to June 2009) for five hours a day, twice a week (R. 187).

The ALJ concluded that Mr. James's limitations were not as disabling as Mr. James described them to be based upon his capacity to travel independently by bus, cook food using a microwave, and clean and dress himself (R. 36). However, the ALJ did not mention that Ms. James (the aunt) repeatedly instructed Mr. James how to ride the bus and accompanied him several times before he was able to ride it alone. Similarly, both Ms. James and Mr. James testified that Mr. James needed frequent reminders regarding his chores (R. 69). As to Mr. James's passing "C" grades, the ALJ neglected to mention that Mr. James attends school on a part-time basis and receives substantial academic assistance because he failed numerous courses when taking a full load (R. 71). The ALJ also equated Mr. James's ability to use computer toggles and joysticks while playing video games at home with an ability to "multitask" and engage in activities that require concentration, persistence, and pace. While we recognize that the ALJ was in the best position to consider Mr. James's credibility, and that it was proper for the ALJ to consider the claimant's daily activities in judging disability, the Seventh Circuit has urged caution in equating these activities with the challenges of daily employment in a competitive environment. *See Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) ("[A] person's ability to perform full-time, daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time"); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) ("the pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment, as well, often differ dramatically between home and office or factory or other place of paid work"). On remand, the ALJ should assess Mr. James's activities of daily living in light of the Seventh Circuit's directives on this point.

## CONCLUSION

For the reasons set forth above, the Court grants Mr. James's motion to reverse and remand the ALJ's decision (doc. # 15), and denies the Commissioner's motion to affirm the judgment (doc. # 22). The judgment of the Commissioner is reversed and the case remanded for further proceedings consistent with this Memorandum Opinion and Order. This case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: October 5, 2015